**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 25-cr-278-WJM-1

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. ANTHONY GENE MIRANDA,

Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART**
**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

---

Before the Court is Defendant Anthony Gene Miranda's Motion to Suppress Evidence and Statements ("Motion") (ECF No. 48). The Government filed a response (ECF No. 51), and the Court thereafter granted Miranda leave to file a reply (ECF Nos. 53, 55). The Court held an evidentiary hearing on the Motion on August 5, 2026. (ECF No. 59.)

For the following reasons, the Court grants in part and denies in part the Motion.

## I. BACKGROUND[1]

At 9:22 A.M. on June 17, 2025, Colorado Springs Police Department officers

---

[1] This Background is derived from the parties' briefs on the Motion, the documents submitted in support thereof, and the documentary and testimonial evidence adduced at the August 5, 2026 evidentiary hearing. All citations to docketed materials are to the page number in the CM/ECF heading, which sometimes differs from a document's internal pagination. In addition, quotations from the evidentiary hearing are taken from the rough draft of the transcript ("Tr.") prepared by the Court Reporter, which is subject to revision before it is finalized. The Government conventionally submitted its Exhibits 1 through 3 and resubmitted Miranda's Exhibits A through M. (ECF No. 54; *see* ECF Nos. 52 & 49.) Miranda submitted Exhibits N through S. (ECF No. 58.) Because some of these exhibits, particularly those containing body-worn camera footage ("BWC"),

responded to a 911 call reporting a theft at Mike's Plumbing and Heating ("Mike's"). (Exhibit M at 1.) The caller, Michael DeLuca, identified two suspects in his message to the dispatcher: (1) a white female in her 20s to 30s standing at 5'4", medium weight, with maroon shoulder length hair, and wearing a black hoodie and maroon pants and (2) a white male in his 20s to 30s standing at 5'8", medium weight, wearing a red shirt, black pants, a black hat, and carrying a black backpack. (*Id.*; Exhibit A at 5; *see* Exhibit C (photograph of suspects from the back).)

Responding officers Ryan Paine and Mark Mosbach spoke to DeLuca and other staff at Mike's. (Exhibit G at 0:55–6:33.) The staff reported that the suspects went inside the shop's yard and stole about $1,000 of scrap copper "pumps," a "sawzall" power tool, and a shopping cart to carry the items. (*Id.* at 3:43–4:30.) The staff often referred to "she" or "her" when discussing the person who was taking the items, while using "they" or "them" when referring to the suspects jointly. (*See id.* at 0:55–6:33.) DeLuca told the officers that he chased after the suspects and took a picture of them, which he showed and sent Officer Paine. (*Id.* at 2:52–2:55, 4:50–5:03.)

At 9:46 A.M., Officer Paine located Miranda and Samara Yingling-Winbush sitting at a parking lot at 800 S. Circle Dr., about 0.7 miles away from Mike's. (*Id.* at 10:03; ECF No. 58-3; ECF No. 51 at 3 n.4.) After exchanging some greetings, Officer Paine told them that "We just had a theft down the street . . . You kind of look like you might match the description." (Exhibit G at 10:25–10:31.) They asked him what was stolen, and Officer Paine said "some metal and stuff, which is what you guys have here." (*Id.* at 10:33–

---

are without a specific CM/ECF docketing number, this Order refers to certain exhibits by their number or letter designation.

10:36.) In Officer Paine's BWC of the interaction, metal pipes are visible protruding out of a blue tote bag near where Yingling-Winbush was sitting. (*See, e.g.*, *id.* at 11:34–11:44.)

Miranda then told Officer Paine that there was a shopping cart on the sidewalk near a trash can and that "we grabbed a couple of the copper things out of the cart and put it in our bag." (*Id.* at 10:37–10:51.) Officer Paine then asked for their IDs and checked for warrants through dispatch. (*Id.* at 10:55–11:30.) Miranda began asking questions about the theft, such as, "Where was the copper supposedly stolen from?" (*Id.* at 11:13.)

Officer Paine advised Yingling-Winbush and Miranda that they were being detained. (*Id.* at 11:07.) After obtaining their names and dates of birth, Officer Paine began asking them questions, starting with, "Where are you guys coming from?" (*Id.* at 12:47–12:49.) He continued to ask about the Target cart and what was inside of it. (*Id.* at 12:55–13:20.) Officer Paine then told them to "hang tight," while he ran a background check on them. (*Id.* at 13:48; *see* Tr. 32:20–22.)

A few minutes passed before Officer Paine reiterated to Yingling-Winbush and Miranda, "Like I said, you guys are detained right now. You're not free to leave at all." (*Id.* at 18:16–18:20.) Officer Jenna Marie Adams joined Officer Paine. (Exhibit I at 0:45.) Officer Paine noted that he could see drug paraphernalia—specifically, burnt foil with residue—near the bags Miranda was photographed carrying. (Exhibit G at 18:24; Exhibit I at 1:12; Exhibit 1 at 4.) Yingling-Winbush then pointed to the ground and explained that the drug paraphernalia was already there when they had arrived. (Exhibit G at 18:27.)

Officer Paine told Miranda that he would place him in handcuffs. (*Id.* at 18:36.) Miranda asked why and Officer Paine responded that Miranda was suspected of committing a crime. (*Id.* at 18:39–19:24.) When Officers Paine and Adams tried to

handcuff Miranda, he fled. (*Id.* at 19:39.) The officers chased him and tased him multiple times. (*Id.*) Miranda jumped a fence and fell to the ground, after which the officers tased him again. (*Id.* at 19:39–19:50.) Meanwhile, Officer Timothy Bastian arrested Yingling-Winbush, who told him that Miranda "has a gun on him." (Exhibit J at 2–3.)

The officers tried to handcuff Miranda and he resisted. (Exhibit G at 19:50–22:18.) While Miranda was pinned to the ground, Officer Paine tased him twice more. (*Id.* at 20:24–21:05.) Officer Kirby arrived, placed the barrel of his gun on Miranda's head, and threatened to kill Miranda: "Fucking touch the gun—don't do shit—or I'm going to kill you." (*Id.* at 21:30–21:40.) Miranda stopped resisting and the officers handcuffed him. It appears that Miranda denied having a gun while he was being arrested. (*See* Exhibit 2 at 1:08–1:10 (one officer saying that Miranda said he did not have a gun on him).) Officer Daniel Mork arrived at the scene and began removing things from Miranda's person. (Exhibit 2 at 1:27.)

On the ground, Miranda asked Officer Mork, "Can I just talk to you?" and then Miranda discussed his experience with the criminal legal system, prison, and parole. (*Id.* at 3:05–3:42.) Finally, Miranda stated "that right there is going to end my life," referring to an item in his right pocket. (*Id.* at 3:39–42; *see* Exhibit L at 2.) Officer Mork asked Miranda, "Is it a pistol?" (Exhibit 2 at 3:42.) Miranda repeated that it would end his life. (*Id.* at 3:44–3:45.) Miranda explained, "I feel like I have equal rights to protect myself because everybody else—they don't play by the rules." (*Id.* at 4:01–4:03.) Miranda then said, "I just fell on top of it. I didn't even know it was here." (*Id.* at 4:55–5:04.) Officer Mork rolled Miranda over, removing a small black handgun from his pocket, loose cartridges of ammunition, and a methamphetamine pipe. (*Id.* at 4:52–6:25; Exhibit A at 7.)

Officer Mork helped Miranda stand up and Miranda indicated to Officer Mork that he had no medical concerns. (Exhibit 2 at 6:36–7:05.) Officer Mork told Miranda, "When we're all said and done here man . . . I'm going to read your rights, and we're going to talk openly if that's cool, all right?" (*Id.* at 8:00–8:06.) The two made some small talk, and then Officer Mork asked Miranda, "You take a POWPO charge with the special offender, too?" as well as other questions about what Miranda was "on paper for." (*Id.* at 9:30–9:40.) Officer Mork then escorted Miranda to a police car. (*Id.* at 9:52.)

At the car, Miranda told Officer Mork, "I know my rights, you don't have to read them to me." (*Id.* at 13:00–13:03.) Officer Mork *Mirandized* him anyway. (*Id.* at 13:08–13:30.) Officer Mork began questioning Miranda, asking him why he had spoken to police, what items he was suspected of stealing, and what had happened between him and Officer Paine; Miranda also made some statements about the handgun. (*Id.* at 13:31–23:17.) Specifically, Miranda told Officer Mork, "I fell on it," referring to the handgun. (*Id.* at 18:33.) Officer Mork responded that "no one's going to believe that." (*Id.* at 18:48–18:55.) Then, Officer Mork asked Miranda if he had bought the pistol "from the streets," to which Miranda responded, "Yes." (*Id.* at 19:04–19:08.) Miranda then admitted to where and how he bought the handgun as well as his prior convictions. (*Id.* at 20:38–21:30.) Miranda made several more incriminating statements in the patrol car on the ride to and at the hospital. (Exhibit 3 at 0:00–12:40, 24:43–1:25:20.)

Officers Paine and Adams did not report seeing a firearm during the pursuit; Officer Paine reported he did not feel a gun when restraining Miranda. (Exhibit B at 5–6, 8.)

After the arrest, the officers searched Miranda's and Yingling-Winbush's items in the parking lot, finding methamphetamine, baggies, a scale, pieces of mail, identification

cards, checks, and other people's bank information. (Exhibit J at 3.)

## II. LEGAL STANDARD

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "For a search or seizure to be reasonable, it must ordinarily be supported by a warrant based on probable cause." *United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021). "The defendant has the burden of showing the Fourth Amendment was implicated, . . . while the government has the burden of proving its warrantless actions were justified." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (internal citations omitted).

Similarly, where a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), is alleged, once a defendant presents evidence or allegations sufficient to support a motion to suppress, "the Government must then carry the countervailing burden of proving a waiver of the constitutional privilege against self-incrimination." *United States v. Crocker*, 510 F.2d 1129, 1135 (10th Cir. 1975) *abrogated on other grounds by United States v. Bustillos-Munoz*, 235 F.3d 505, 516 (10th Cir. 2000); *United States v. Fountain*, 776 F.2d 878, 886 (10th Cir. 1985); *Bond v. United States*, 397 F.2d 162, 165 (10th Cir. 1968).

"On a motion to suppress, the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *Goebel*, 959 F.3d at 1265.

## III. ANALYSIS

First, Miranda moves to suppress all evidence as fruit of the poisonous tree, arguing

that his detention and arrest violated the Fourth Amendment. Second, Miranda moves to suppress all the statements he made to law enforcement, arguing the statements were involuntary and part of a custodial interrogation that violated the Fifth Amendment and *Miranda*.

### A. Fourth Amendment

In the Motion, Miranda argued Officer Paine lacked reasonable suspicion justifying the initial investigatory stop and probable cause supporting the detention and that thus, all of the evidence found on his person and found among his belongings should be suppressed. At the evidentiary hearing, however, Miranda conceded Officer Paine had reasonable suspicion to detain him based on (1) the matching appearance, (2) the matching bags, (3) the fact that the bags contained the copper pipes, and (4) Miranda being located near the site of the theft. (Tr. 104–105.) The Court finds these items do in fact establish reasonable suspicion sufficient to permit the lawful initial detention of Miranda.

Thus, the Court considers below only whether probable cause supported the arrest. The Government concedes that Officer Paine's second detention advisement constituted an arrest and thus a seizure for Fourth Amendment purposes. (Tr. 98–99.) The burden thus shifts to the Government to show that Officer Paine had probable cause to justify the arrest. The Court concludes there was.

"Arrests must be based on probable cause. Probable cause to arrest exists when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998). Put differently, "[p]robable cause exists when under the totality of

the circumstances there is a reasonable probability that a crime is being committed." *United States v. Traxler*, 477 F.3d 1243, 1247 (10th Cir. 2007). Further, "the probable cause inquiry is not restricted to a particular offense, but rather requires merely that officers had reason to believe that a crime—any crime—occurred." *United States v. Turner*, 553 F.3d 1337, 1345 (10th Cir. 2009) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

Here, the Court finds the totality of the circumstances support the conclusion that Officer Paine had probable cause to arrest Miranda. First, the staff at Mike's reported "they" stole the stuff, indicating more than one suspect. DeLuca also indicated that he chased after "them." While showing the suspects' picture to Officer Paine, DeLuca said, "That's the guy," appearing to clarify that there were two suspects and that one was a man. (Exhibit G at 5:00.)

Second, Miranda matched the description and photo that DeLuca gave Officer Paine, which weighs in favor of finding that Officer Paine had probable cause. *See Easton v. City of Boulder, Colo.*, 776 F.2d 1441, 1449 (10th Cir. 1985) ("[W]hen examining informant evidence used to support a claim of probable cause for a warrant, or a warrantless arrest, the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness."); Wayne R. LaFave *et al.*, 2 *Crim. Proc.* § 3.3(d) (4th ed. Nov. 2025 update) (lower courts have taken position that officers may presume veracity of victim and witness statements, so that "if the citizen or victim informant is an eyewitness this will be enough to support probable cause even without specific corroboration of reliability") (quoting *Allison v. State*, 214 N.W.2d 437, 442

(Wis. 1974)); *see also Illinois v. Gates*, 462 U.S. 213, 234 (1983) ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case.").

Even more significant, Miranda's appearance matched that of the suspect in the photograph taken by DeLuca almost identically. *See United States v. Brinson*, 772 F.3d 1314, 1324–25 (10th Cir. 2014) (concluding that arresting officers had probable cause because, among other things, the defendant matched motel clerk's description of suspect and photo identification of guest registered to the suspected room); *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining that defendant's resemblance to suspect in surveillance video was most significant factor giving police not only reasonable suspicion but probable cause for arrest). Officer Paine found Miranda wearing a sleeveless red shirt and a black hat and sitting near a blue-and-yellow tote bag, a red-and-white tote bag, and a black backpack—all of which were depicted in DeLuca's photo. *Compare* Exhibit G *with* Exhibit C.

Miranda argues that "[t]he photograph does not show him . . . carrying stolen items." (ECF No. 48 at ¶ 18.) But when Officer Paine found Miranda and Yingling-Winbush at the parking lot, he "observed copper pipes sticking out of the blue/yellow, black, and red distinctive bags that matched the bags carried by the defendant in DeLuca's photograph." (ECF No. 51 at 8.; *see* Exhibit C (picture of suspect carrying bags).) Officer Paine observed bags containing likely stolen items within Miranda's vicinity which Miranda appeared to have been carrying immediately following the reported theft. So, Officer Paine could have justifiably inferred it was likely that Miranda had committed the reported theft,

or some other potentially related crime.

Also, Officer Paine found Miranda and Yingling-Winbush near the location of the theft, about a half-mile away. *See Sherouse v. Ratchner*, 573 F.3d 1055, 1061 (10th Cir. 2009) ("Based on her physical resemblance to the robber, her proximity to the robberies, and the officers' reasonable belief that several of the witnesses had suggested she was the robber, a reasonable inference can be drawn that the officer had probable cause to arrest" the defendant.).

Further, Officer Paine observed drug paraphernalia, and at the very least, could have suspected Miranda had committed some drug offense. *See Turner*, 553 F.3d at 1345 (probable cause analysis merely requires officers to reasonably believe that defendant had committed *any* crime). At the evidentiary hearing, Officer Paine testified that he observed the paraphernalia as he gave Miranda and Yingling-Winbush the first detention advisement, before the arrest. So, while Officer Paine had not yet conducted the arrest at that point, the drug paraphernalia contributed to his probable cause.

Notably, without being asked by Officer Paine, Miranda admitted that "we grabbed a couple of the copper things out of the cart and put it in our bag." (Exhibit G at 10:37–10:51.) Although Miranda never confessed to a crime, his admission that he and Yingling-Winbush had grabbed copper pipes would give Officer Paine reason to believe that Miranda had likely committed some crime related to the reported theft.

Miranda's central argument for suppression of evidence is that "[p]roximity to a person committing a crime is not, without more, participation in it." (ECF No. 48 at ¶ 19.) At the evidentiary hearing, Miranda argued that "it's not reasonable to detain someone and to arrest someone for merely being around somebody committing a crime." (Tr. 113:7–

10.) Indeed, the Tenth Circuit has frequently relied on the principle that "[m]ere propinquity to others independently suspected of criminal activity creates neither probable cause nor reasonable suspicion." *United States v. Huerta*, 166 F.4th 866, 874 (10th Cir. 2025) (quoting *Poolaw v. Marcantel*, 565 F.3d 721, 737 (10th Cir. 2009)). But Officer Paine relied on more than just proximity when he arrested Miranda. Furthermore, DeLuca, the 911 caller, reported *two* suspects in connection with the theft, so it is not the case that *only* Yingling-Winbush was "independently suspected of criminal activity," *Huerta*, 166 F.4th at 874. In any case, Miranda's concession on reasonable suspicion at least demonstrates Miranda's implicit concession that he was not merely suspected due to his proximity to Yingling-Winbush.

Relatedly, the Court considers Miranda's argument that he was the wrong person to detain (*see, e.g.*, Tr. 120–21), in light of the Government's concession at the hearing that Miranda was not the person who committed the theft (Tr. 122–23).[2] To that end, the Government suggested that Officer Paine had probable cause that Miranda had committed "[r]eceipt of stolen property, accessory after the fact, . . . complicit[y] in the theft, and" unlawful drug possession. (Tr. 123:6–9; *see* ECF No. 51 at 8 ("At minimum, the defendant's possession of copper pipes near bags he was observed carrying supplied suspicion that he had received stolen items in violation of Colo. Rev. Stat. Ann. § 18-4-401(1) (theft by receiving).").) The Court agrees with the Government that any of these possible crimes could support Officer Paine's probable cause.

---

[2] According to the Government, Yingling-Winbush "was charged with [a] misdemeanor . . . in El Paso County Court for" the theft but she also "had a pending felony case, so . . . the El Paso [District Attorney] dismissed the misdemeanor theft case as part of a plea for the felony case." (Tr. 123:12–17.)

When Officer Paine arrested Miranda, these circumstances supported "a substantial probability that the suspect committed the crime." *Storey v. Taylor*, 696 F.3d 987, 992 (10th Cir. 2012). Thus, the Court finds that the totality of the circumstances, most notably Miranda's matching to the suspect photograph and description and that he had admitted to having the copper pipes, establish that there was probable cause to arrest Miranda.

**B. Fifth Amendment**

This Motion also hinges on whether Miranda's *Miranda* rights were violated. Miranda argues all his statements made to law enforcement should be suppressed. (ECF No. 48 at ¶ 37.) The Court agrees in part.

Under *Miranda*, a suspect's statements are generally inadmissible as violative of the Fifth Amendment if law enforcement officers elicited them during a custodial interrogation without giving the prescribed warnings and obtaining a waiver. 384 U.S. at 444, 478–79. But, "it is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question. Instead, *Miranda* only applies when an individual is subject to custodial interrogation." *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (citation modified). "Thus[,] two requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.' " *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).

Concerning custody,

> a person is not in custody for *Miranda* purposes unless his freedom of action is curtailed to a degree associated with formal arrest. Furthermore, *Miranda*'s 'in custody' requirement is measured objectively, the proper inquiry being whether a reasonable person in the suspect's position would have understood his situation as the functional equivalent of formal arrest.

*Hudson*, 210 F.3d at 1190 (internal quotation marks and citation omitted; alterations incorporated). Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). This definition focuses on the coercive effect of the officers' words or actions on the suspect. *Id*.

Even where *Miranda* does not apply, any statements extracted from a defendant must still have been made "voluntarily." *See, e.g.*, *Beckwith v. United States*, 425 U.S. 341, 348 (1976) (statements resulting from noncustodial questioning can still be challenged on voluntariness grounds); *Lego v. Twomey*, 404 U.S. 477, 487–88 (1972) (treating the voluntariness of a confession as a separate issue from *Miranda* warnings). Voluntariness is judged under an expansive standard:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). This inquiry requires considering the "totality of the relevant circumstances of a particular situation." *Id.* at 606. With respect to a defendant's statements, "[t]he burden of proof is on the government to prove the statements were voluntary." *United States v. Muniz*, 1 F.3d 1018, 1021 (10th Cir. 1993).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' " *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Accordingly, the Tenth Circuit has outlined several factors for courts to consider when evaluating whether statements were made voluntarily: "(1) the Defendant's age, intelligence, and education;

(2) the detention's length; (3) the questioning's length and nature; (4) whether law enforcement advised Defendant of his constitutional rights; and (5) whether law enforcement subjected Defendant to physical punishment." *United States v. Pena*, 115 F.4th 1254, 1261 (10th Cir. 2024).

For the purposes of its analysis, the Court divides Miranda's statements into three stages: (1) the encounter with Officer Paine until he first attempted to handcuff Miranda, (2) the time between when Officer Paine was attempting to handcuff Miranda and the time Officer Mork was walking Miranda to the patrol car, and (3) the statements Miranda made after Officer Mork advised him of his *Miranda* rights. The Court begins by discussing Stages 1 and 3 because the statements Miranda made there are clearly admissible.

Miranda was not subject to a custodial interrogation during Stage 1, so there was no need for a *Miranda* advisement at that point. Indeed, Stage 1 was simply an investigatory stop, and it is "well established that a defendant is not in custody under" a voluntary cooperation or an investigatory stop "and therefore *Miranda* warnings need not usually be given." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). As the Government notes, Miranda was not surrounded by police and "Officer Paine's questions were conversational and brief until he ordered the defendant to stand to be handcuffed. The defendant even felt free to volunteer his own account for the metal observed on scene in response. These circumstances indicate that the defendant was not in custody per *Miranda*." (ECF No. 51 at 14.)

As to Stage 3, the Government argues "[t]hese custodial interviews are admissible because a *Miranda* warning was given." (ECF No. 51 at 17–18.) The Court agrees with the Government. At the outset of Stage 3, Officer Mork *Mirandized* Miranda. Officer Mork

testified that when he first arrived, he "tr[ied] to calm [Miranda] a little bit, to let him know the situation was over with," (Tr. 74:12–13.), and by the time Officer Mork had given the *Miranda* advisement, tensions had cooled as Miranda's demeanor was much more relaxed. (*See* Exhibit 2 at 13:00–13:30.) The *Miranda* advisement and Officer Mork's efforts to calm Miranda down constituted intervening events that separate Stage 2 from Stage 3. And so, as to statements from Stage 3, Miranda properly received a *Miranda* advisement and made statements voluntarily.

As to Stage 2, however, Miranda argues that "[j]ust before Mr. Miranda made the statements to Officer Mork, he had been tased, tackled, and threatened with a gun to his head. Under these circumstances Miranda contends his statements cannot be said to be voluntary nor can his wavier of rights be said to be knowingly and voluntarily waived." (ECF No. 48 at ¶ 40.) The Court agrees.

Stage 2 resembles the inadmissible statements described in the Tenth Circuit's opinion in *United States v. Perdue*. There, the Tenth Circuit held that the defendant's "statements were made involuntarily . . . because of the overwhelmingly coercive atmosphere created by many different elements." *Perdue*, 8 F.3d at 1466–67. The Tenth Circuit came to this conclusion based on the following observations:

> Of particular importance are the isolated location in which the interrogation took place, the rapidity with which the events unfolded, the officers' use of guns, the placement of the suspect face down in the dirt prior to interrogation, the fact that Officer Carreno stood above Mr. Perdue with his gun drawn during the questioning, and the failure to provide *Miranda* safeguards.

*Id.* at 1467.

For similar reasons, the Court concludes the statements Miranda made during Stage 2 were involuntary. Just as in *Perdue*, the events unfolded quickly, Officer Kirby

pulled out his gun, the officers placed Miranda face down in the dirt after he had fallen, and none of the officers *Mirandized* Miranda. And even more egregious than the events of *Perdue*, the officers here had already tased Miranda at least 5 times, and most notably, Officer Kirby threatened to kill Miranda while pressing the barrel of his service weapon to Miranda's head. Surely from Miranda's perspective, having already been tased multiple times and tackled to the ground by several officers, followed by the threat to be killed on the spot by one of those officers, any semblance of a noncoercive or nonthreatening character to the encounter with law enforcement had long since vanished. Under the totality of these circumstances, the Court easily concludes that the Government has failed to demonstrate that Miranda's statements during Stage 2 were remotely voluntary.

For these reasons the Court will suppress all of the statements Miranda made during Stage 2, as that time period is defined above.

## IV. CONCLUSION

For all these reasons, the Court GRANTS IN PART AND DENIES IN PART the Motion (ECF No. 48). The Court ORDERS as follows:

1. The Motion is GRANTED as to the statements Miranda made during Stage 2, which are hereby SUPPRESSED.
2. The Motion is DENIED in all other respects.

Dated this 24th day of August, 2026.

BY THE COURT:

William J. Martínez
Senior United States District Judge